Cael W. Peterson, J.
This is a motion made by the City of Syracuse under section 16 of the City Home Rule Law, for a review of certain objections filed by the City of Syracuse with the court on May 3, 1956 relative to a certain petition for a referendum filed pursuant to section 19-a of the City Home Rule Law by William Gr. Wright and other persons with the city clerk on April 6, 1956. The petition sets forth a proposed local law to amend sections 11, 71 and 92 of the City Charter (Local Laws, 1935, No. 7 of City of Syracuse) to provide, among other things, minimum salary schedules for certain designated members of the police and fire departments, to prohibit the Common Council from reducing such salaries, and requiring revision of the 1957 budget and appropriation of additional funds therefor. Thereafter, the Common Council adopted an ordinance on April 30, 1956 authorizing the corporation counsel to file objections to the petition and objections to the petition were filed with the Supreme Court May 3, 1956.
In substance the objections are:
1. That the plan to provide moneys and revenues sufficient to meet such proposed expenditures and increases required by the proposed local law 11 by increasing the general tax levy on real property in the City of Syracuse ’ ’ is insufficient, inadequate, invalid and illegal.
2. That said proposition cannot be submitted to the voters of the City of Syracuse by referendum at the next general election to be held therein on November 6, 1956 as provided in said petition for the reason that said general election is to be held in an even-numbered year and submission of such referendum being a municipal question, may not legally be submitted at an election held in an even-numbered year.
After objections were filed and on the application of the City of Syracuse, an order to show cause was granted by the Honorable Frank Del Veochio May 3, 1956, ordering, among other things, certain service to be made on the various parties, ordering that they show cause why an order should not be made declaring said petition and proposed local law illegal, unconstitutional, invalid and insufficient in law, restraining the city clerk *716 from transmitting the petition and proposed local law to the Board of Elections, and restraining the Commissioner of Elections from placing the proposition on the ballot for November 6, 1956. The order was returnable on May 7, 1956. On the return day, affidavits of service and publication were filed showing compliance with the order and the matter was adjourned to June 4, 1956 and it was stipulated to submit the matter to the Appellate Division on an agreed statement of facts. The same was argued in the Appellate Division on May 16, 1956 and thereafter the Appellate Division dismissed the proceeding without prejudice (City of Syracuse v. Wright, 1 A D 2d 577, 578). The Appellate Division observed that “ Thus two unknown factors are presented in the form of factual questions upon which the parties are not in agreement, namely, the estimated cost of the proposed plan and the over-all increases to be included in the general tax levy on real property for other purposes not only to finance the proposed plan but for other additional fiscal needs of the city for the coming year ”, and suggested that the proceeding should be heard at a Special Term upon the verified petition and such oral or written proof as may be offered.
The proceeding was thereafter stipulated to be heard at the June Equity Term held in the county of Onondaga on the objections and motion of the city and the order to show cause above referred to. The court is authorized by section 16 of the City Home Rule Law to hear and determine the matters in the manner prescribed by section 335 of the Election Law.
Testimony has been taken in the matter which the court feels resolves the facts in favor of the proponents of the referendum.
Since this involves questions of fact, evidence submitted will be discussed later in this memorandum after the question of law raised in the proceeding has been considered, to wit, whether the proposed local law may be submitted to the electorate at the general election in November of this year.
Section 19-a of the City Home Rule Law specifically sets forth as follows: “ If a referendum is required, the legislative body may submit it to the electors of the city at the next general election ”. Counsel for the City of Syracuse urges with great persuasion that section 15 of article IX of the New York State Constitution prohibits the submission of the referendum to the voters at the next election. Section 15 of article IX of the New York State Constitution reads as follows: “ All elections of city officers, including supervisors, elected in any city or part of a city, and of county officers elected in any county wholly included in a city, except to fill vacancies, shall be held on the Tuesday succeeding the first Monday in November in an odd- *717 numbered year, and the term of every such officer shall expire at the end of an odd-numbered year. This section shall not apply to elections of any judicial officer.” (Formerly § 6 of art. XII, renum. and amd. by Constitutional Convention of 1938, approved by the People Nov. 8,1938.)
The city then cites section 14 of the Second Class Cities Law. This section provides: “ Elections. All elections of city officers, including supervisors and judicial officers of a city court or inferior local court, shall be held on the Tuesday succeeding the first Monday in November, and, except to fill vacancies, in an odd-numbered year. All such elections shall be held at the same time and places as the general election held in such year, and shall be conducted in all respects in the same manner as general elections in cities are required to be conducted, and all the provisions of law relative to such elections shall be applicable to the election for officers of the city. In case of the failure to elect an elective city officer, except as otherwise provided herein, the office shall be deemed to be vacant for the purpose of choosing a successor and the vacancy shall be filled in the manner provided herein for the filling of a vacancy in such office happening otherwise than by expiration of term.”
Both parties agree that the proceeding involves the subject of a mandatory referendum. Therefore, if section 15 of article IX of the New York State Constitution is applicable, this proceeding is within the prohibition enunciated therein and the presentation of the local law to the voters of Syracuse at the coming fall election is prohibited. The case of Mills v. Sweeney (219 N. Y. 213) is cited by the City of Syracuse as authority for its position that this law may not be voted on at the next election, the city maintaining in effect that this ease, under the doctrine of stare decisis is determinative of this point in the proceeding. The-city contends that the Mills case holds that a question involving municipal administration may not be submitted to the People for decision in an even-numbered year and argues that this has been recognized as the law since the decision in the Mills case in 1916. Cases cited by the city where this conception of the law has been followed included opinions of the New York State Comptroller, and the city concluded that the constitutional policy is firmly established prohibiting the submission of a municipal question involving local adminstration in an election in an even-numbered year.
With this interpretation of the holding in the Mills case this court is not in concurrence. An examination of the Mills case shows that the court decided the issue on the ground that the particular ordinance which was the subject of the proceeding *718 was void for being in conflict with the City Charter of Buffalo. Then followed the part of the opinion that has been relied upon in the cases cited by the city as holding that a municipal public policy question may not be submitted to the voters in an even-numbered year. I quote that portion (pp. 218-219): “If it be deemed to authorize the enactment of a similar ordinance it might happen that at a general election for state officers numerous questions of municipal public policy could be submitted to the electors in every second-class city in the state. It is a part of our governmental policy, as announced in the Constitution (Art. XII, § 3), that city officers shall not be chosen at an election of state officers. The same policy forbids voting upon municipal questions at such election; yet an ordinance of this character, if valid, not only permits but may require that very thing to be done.”
An examination of the case discloses that this portion of the opinion had no bearing on the decision and was not the basis upon which the decision was made and lies wholly in the area of the law known as dicta.
Since this court holds that the Mills case is not a precedent on this point, it becomes necessary to look elsewhere for guidance in reaching a decision herein. To do so this court has had recourse to the guideposts of the law that have been erected and steadfastly maintained by the courts. The one guidepost that is of benefit here in reaching a decision is that in which the Court of Appeals has said: “We read the law as written.” Time and again the Court of Appeals has interpreted a statute or constitutional provision as written, rather than interpreting some meaning into it that is not clearly written therein. The cases where the court has done so are many. I cite a few: Cooper-Snell Co. v. State of New York (230 N. Y. 249, 255); Matter of Bristol v. Buck (201 App. Div. 100, 102, affd. 234 N. Y. 504); Matter of New York & Brooklyn Bridge (72 N. Y. 527); People v. Fishkill & Beekman Plank Road Co. (27 Barb. 445); People ex rel. Griffin v. Mayor of Brooklyn (4 N. Y. 419); Humphrey v. Chamberlain (11 N. Y. 274); Newell Universal Mill Co. v. Muxlow (115 N. Y. 170).
With this guidepost to point the way the court takes up the interpretation of section 15 of article IX of the New York State Constitution. The provision says that ‘‘ All elections of city officers * * * shall be held * * * in an odd-numbered year ”. This section is silent concerning questions of administrative policy. To read any meaning into the section other than its clear import is to destroy one of the landmarks of the law *719 as carefully made and held by the Court of Appeals through these many decades and to render meaningless clear words with certain and definite meaning. It seems clear to this court that there is no prohibition in the New York State Constitution against the submission of the referendum at a general election in an even-numbered year.
As we have already stated, section 19-a of the City Home Rule Law sets forth as follows: “ If a referendum is required, the legislative body may submit it to the electors of the city at the next general election ”. The authority to submit the referendum in the present case seems clearly set forth by legislative act.
This court, therefore, holds that there is no constitutional prohibition to the submission of this proposition to the voters of the City of Syracuse at the next general election to be held November 6, 1956.
There remains to be decided whether or not the proponents of the plan in question have conformed to section 19-a of the City Home Rule Law. Section 19-a of the City Home Rule Law provides in part as follows: “ No such proposed local law requiring the expenditure of money shall be accepted by the city clerk or be adopted or become effective unless there shall be submitted as a part of such proposed local law, a plan to provide moneys and revenues sufficient to meet such proposed expenditures.”
The plan proposed is ‘ ‘ that the amount of increased expenditures required by this Local Law shall be obtained by increasing the general tax levy on real property.” It is agreed by the parties that for the year 1957 the city may within the limits imposed by law increase the general tax levy on real property therein $2,071,223.67 over the amount it imposed as taxes on real property for revenue for general city purposes for the year 1956. The proponents of the referendum estimate the cost of the plan to be $685,000. The City of Syracuse in its estimate places the cost of this plan at $722,560 and urges that if it is to be consistent it must take into consideration not only the increased expenditure of the plan but other increases or requested increases over the 1956 budget which the city will be faced within making up its 1957 budget.
On the trial the city offered evidence that from information and requests received from various sources, it is indicated that the increases in the 1957 budget, charged against the 2% constitutional tax limitation, over the appropriation in the 1956 budget, may amount to the sum of $3,033,484. The items making up the total are as follows:
*720 Fire and Police salary increases based on the plan submitted for the referendum:
For Fire.................................... $400,970
For Police .................................. 321,590
For Police salaries due to the 40-hour week mandated law increased personnel................ 169,300
For Department of Education increases proposed in a memorandum submitted by the Board
of Education .....................!......... 1,111,624
Salary increases for all other employees based
on an increase of $300 per annum.............. 630,000
Compromise agreement due the State of New
York on account of unpaid traffic fines.......... 100,000
Other normal increases based on normal increases for prior years....................... 300,000
These items total .......................$3,033,484.
The cost of the proposed plan as estimated by the city, to wit, the sum of $722,560, was arrived at by subtracting the amount of salaries paid to men in positions covered by the referendum petition in 1956 from the amount of salaries that will be paid to the same men in 1957 under the proposed referendum plan. Proponents of the referendum claim that this is not the proper manner of computation which should be used to arrive at the increased cost to the City of Syracuse necessitated by the referendum salary increase. The commissioner of finance testified that the salaries of the men in positions covered by the referendum petition would be increased in 1957 under the present city pay plan. This is borne out by the city’s exhibits 4 and 5 which show the cost of the referendum positions in 1957 to be more than the same positions were in 1956. The witness, Morris Brown, testified that by using the computations of the commissioner of finance, as shown on exhibits 4 and 5, the cost of the referendum pay increases amounted to $676,480.
Proponents of the referendum claim that in order to compute the increased cost to the city in 1957 of the result of the referendum pay raise, the salaries which will ordinarily be paid to city employees covered by the referendum petition in 1957 must be subtracted from the salaries to be paid to the same employees under the referendum plan. When this is done according to computation as shown in exhibits 4 and 5, the amount arrived at is $676,480, which reduces the amount claimed by the city in exhibit 7 by $56,080. The court is of the opinion that the cost of the proposed plan should be placed at $676,480.
*721 In exhibit 7 it appears that the amount of $1,111,624 was indicated as the increase in the 1957 budget for the department of education for increases in teachers’ salaries. This amount was arrived at by that department on the assumption that there were approximately 1,325 teachers on the board of education payroll. It is assumed that each teacher should have a $1,000 pay raise in 1957. The commissioner of finance testified that there are only 1,200 school teachers employed by the board of education. If each one of these school teachers were to receive a $1,000 pay raise, the total cost of teachers’ salary increases would amount to $1,200,000 as distinguished from the sum of $1,325,000 as set forth on exhibit 6. This is a reduction of $125,000 in the estim&ted cost of teachers’ salary increases for 1957.
The next item set forth on exhibit 7 is the sum of $630,000 which is reputed to be requested by 2,100 city employees based upon a $300 salary increase in 1957 for each of the 2,100 city employees. The commissioner of finance testified that he did not know how many city employees there are. His estimate of 2,100 was based upon statements made to him by the city auditor. However, expert testimony was offered by Morris Brown in connection with exhibit 18 which shows that there is an average of 1,725 city employees in the city of Syracuse exclusive of police, fire and teacher personnel. Using the factor of 1,725 employees to determine the increased cost to the city for a $300 pay raise in 1957, the amount of $517,500 is arrived at. This is a reduction in the city’s estimate of $112,500 from the estimated amount of $630,000.
Referring again to exhibit 7, it appears that the sum of $169,300 is the estimated cost to the City of Syracuse of 39 additional police and detective personnel necessitated by the police 40-hour-week law. The commissioner of finance further testified that this amount was computed by using the annual salary for an entire year for the 39 extra police officers. The court takes judicial notice of the recent amendment to chapter 360 of the Laws of 1911 re-entitled “ An act to promote the health and efficiency of policemen in certain cities, counties, towns and villages of the state” (L. 1956, ch. 764). This amendment does not take effect until July 1, 1957 and provides that the changes provided by this law shall not be put into effect until 30 days after the law takes effect, which date would be August 1, 1957. It seems apparent that the estimate for the increased cost for such additional police personnel should more accurately be computed from August 1, 1957 and that for the five months’ period, beginning August 1, 1957, *722 the sum of $70,541.66 (or five twelfths of $169,300, the estimate for the entire year). Thus there is another reduction in the city’s estimate in the amount of $98,758.34 in the required expenditures as claimed by the City of Syracuse.
It is apparent that reductions in the total amount stated on exhibit 7 may amount to $392,338. There is left a balance of $2,641,146 which, in the court’s opinion, represents the more accurate estimate based upon evidence produced at the hearing. This figure is arrived at as follows:
Amount claimed per exhibit 7............ $3,033,484.
Reductions ............................. 392,338.
Balance ............................ $2,641,146.
Proponents of the referendum, however, claim that the sum of $3,033,484 shown on exhibit 7 or the sum of $2,641,146 shown above is merely speculation and conjecture. Both the Mayor of the City of Syracuse and the president of the Common Council, Melaine Kreuzer, testified that the board of estimate has taken no official cognizance of these amounts. They further stated that such estimates are not binding on the board of estimate. Melaine Kreuzer testified that customarily departmental requests are not granted as requested but are reduced in some amount.
Assuming that the City of Syracuse may be required to make increased expenditures for the year 1957 in the sum of $2,641,146, the proponents of the referendum contend that there is more than sufficient increased revenue available in 1957 to offset the increased expenditures. As previously stated, it is admitted by the City of Syracuse that the real estate tax in said city in 1957 may be raised to increase the revenue therefrom in an amount of $2,071,223.67. The commissioner of finance testified that in 1957 the City of Syracuse will have increased surplus from 1955 available in an amount of $171,913.59. This sum is also available for general city purposes, as is the increase from the real property tax. In addition to the foregoing sums, testimony was given by Melanie Kreuzer that the City of Syracuse has approved a contract for the sale of the Syracuse sewage plant to the County of Onondaga for the sum of $1,200,000.
The witness, Morris Brown, also testifying in conjunction with exhibit 16, stated that the City of Syracuse will derive revenues during the year 1956 in excess of the amount estimated by the commissioner of finance in the sum of $1,062,112. In other words, based upon accurate means of forecasting revenues *723 as shown by exhibit 16 at the end of the year 1956, the City of Syracuse should have a surplus revenue for 1956 in excess of $1,000,000. This money is available for general city purposes during the year 1957.
Section 94 of the Charter of the City of Syracuse (Local laws, 1935, No. 7 of City of Syracuse) reads in part as follows: ‘ ‘ In case the revenues received by the city exceed the amount of such estimated revenues named in said annual estimate, or in case there remain any unexpended balances of appropriations made for the support of the city government or for any other purpose, then such surplus revenues or such unexpended balances shall, except as otherwise provided by law, remain upon deposit and be included as a part of the estimated revenues for the succeeding year. When any moneys or revenues are received by any officer, department, board, commission or other agency of the city, from any source other than by city tax, which are not otherwise appropriated, such moneys and revenues shall be paid over at once to the Commissioner of Finance and may be used and applied toward and in addition to the funds appropriated, as aforesaid, in such manner as in the judgment of the Board of Estimate may be most beneficial to the city.” Under the authority of section 94 of the City Charter it is manifest that the moneys to be received by the city as surplus revenues for the year 1956 and as the purchase price for the sale of the sewage plant of the City of Syracuse are available for general city purposes for the year 1957.
It would appear that the City of Syracuse will have funds in the year 1957 available for general city purposes in an amount in excess of the funds available in 1956 of $4,505,137.26 as
shown by the following schedule:
Increased real estate tax levy........... $2,071,223.67
Increased surplus available in 1957...... 171,913.59
Bevenue from sale of sewage plant...... 1,200,000.00
Estimate of surplus revenue per
Exhibit 16 ........................... 1,062,000.00
$4,505,137.26.
Even without the money received from the sale of the sewage plant, funds available for 1957 could total $3,305,137.26.
Whether we accept the city’s estimate of $3,033,484 as amount necessary to meet increased expenditures for 1957, or whether we accept the estimate of the proponents of the referendum in the sum of $2,641,146, it would appear that sufficient revenues were available to provide for such increased expenditures.
*724 In the case of Welty v. Heafy (200 Misc. 1010) a taxpayer sought an injunction to restrain the submission of a proposed local law to a referendum under section 19-a of the City Home Rule Law. In that case the said proposed local law provided the source of funds as follows (p. 1011): It “ shall be ‘ raised by general taxation on real estate as far as permissible * * * and any additional moneys required * * * shall be raised by the imposition and collection of taxes * * * through enactment by the Common Council ’ ”. Further in that case the court said (p. 1012): “ The crux of the entire case can be summed up by the questions, does the Local Law provide ‘ a plan to provide moneys and revenues sufficient to meet such proposed expenditures and, what was the legislative intent in requiring a ‘ plan ’ ”? The court found that the legislative intent of the amendment to section 19-a, requiring a plan for revenues, was that the electorate should know how the necessary revenue would be raised and thereby be apprised so that they could vote intelligently on the referendum. The court said (pp. 1012-1013):
“ To read into section 19-a, as amended, a requirement that the ‘ plan ’ must be so specific as to require a tax or group of taxes to be enacted is neither practical nor constitutional. Assuming, arguendo, that the ‘ plan ’ must specify the tax or taxes to be enacted and the rate thereof, where it is a permissive tax, what would happen if the tax yielded insufficient revenue? How could the balance of the fund be raised? The legislative body would be allowed no discretion whatsoever if the tax specified would be required. More important, however, is the constitutional question. Originally, and historically, the enactment of tax laws was a State function. By section 12 of article IX of the Constitution, it delegated that power to the cities. In section 11 of the City Home Rule Law, as amneded, the power of the city to adopt and amend local laws for the levy and collection of city taxes is vested in the local legislative body. It has never been vested in the electorate; yet, that is what plaintiff proposes when he claims that the specific tax to be imposed must be set forth and that no discretion or choice be given to the common council. * * *
‘ ‘ In the case at bar, however, the electorate is put on notice. It is foretold what taxes it may have to meet. At the same time, the Constitution’s grant to the local Legislature is not infringed. The purpose and intentment of the statute, section 19-a of the City Home Rule Law, has been complied with and, in my opinion, the Local Law, if adopted by referendum, would be valid.”
*725 In the instant case, the court is of the opinion that the proposed plan to provide moneys and revenues sufficient to meet proposed expenditures by increasing the general tax levy on property is sufficient, there being sufficient revenue available from all sources, including a tax levy on real property,' to provide for all contemplated increases in expenditures for the year 1957, should the referendum be carried.
The application to restrain the city clerk from transmitting the referendum of the proposed law to the Board of Elections should, therefore, be denied.
Submit order accordingly.